**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

**COLTON HARP AND**
**TAMRA MARIE HARP, h/w**
3321 7th St. NE Apt 307
Minot, ND 58703

*And*

**RAY TILLOTSON**
1005 Trenton Ave
Unit 7
Point Pleasant, NJ 08742

*And*

**VINCENT CICALA AND**
**JESSICA CICALA, h/w**
858 Columbus Ave
Phillipsburg, NJ 08865                    **JURY TRIAL DEMANDED**

*And*

**MIRANDA ROSAS AND**
**GILBERT RAMIREZ ROSAS, JR, h/w**
12426 W. Larkspur Rd
El Mirage, AZ 85335

*And*

**JORGE LUIS MUNOZ PALACIOS**
12 Calle Mora
Ponce, PR 00730

*And*

**JOHN MAZUR- BAKER AND**
**KELSEY MAZUR-BAKER, h/w**
13107 N. Boulevard St.
Vicksburg, MI 49097

*And*

**BENARDINO NIDO AND
KARINA NIDO, h/w**
948 Tecla Court
Rio Rico, AZ 85648

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, New Hampshire 03801

_**Defendant.**_

## PLAINTIFFS' COMPLAINT – CIVIL ACTION

## PARTIES

1.      The Plaintiffs in this action are a group of highly trained and experienced firearms users whose lives were upended by a dangerously defective pistol: the Sig Sauer P320.

2.      Upon the information discovered through research and document production, the Sig Sauer P320 is the most dangerous pistol sold in the United States market.

3.      The Plaintiffs in this action are federal law enforcement agents, police officers, combat veterans, firearms instructors, and civilians who have dedicated significant portions of their lives to the safe use of weapons.

4.      The Plaintiffs in this action trusted Sig Sauer to live up to its reputation as a designer and manufacturer of safe and reliable handguns.

5.      The Plaintiffs in this action trusted Sig Sauer to live up to its promise that the P320 "would not fire unless you want it to."

6.      The Plaintiffs in this action were lied to and let down by Sig Sauer, falling victim to the dangerously designed and manufactured P320.

7.      Plaintiff, Jorge Luis Munoz Palacios ("Plaintiff" or "Officer Munoz"), is an adult individual, citizen, and resident of the State of Puerto Rico residing at the above-captioned address.

2

8.      Plaintiff, Ray Tillotson ("Plaintiff" or "Tillotson"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address.

9.      Plaintiff, Vincent Cicala ("Plaintiff" or "Cicala"), is an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address.

10.     Plaintiff, Jessica Cicala ("Plaintiff" or "Mrs. Cicala"), is the wife of Vincent Cicala, an adult individual, citizen, and resident of the State of New Jersey, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

11.     Plaintiff, Miranda Rosas ("Plaintiff" or "Rosas"), is an adult individual, citizen, and resident of the State of Arizona residing at the above-captioned address.

12.     Plaintiff, Gilbert Ramirez Rosas, Jr. ("Plaintiff" or "Mr. Rosas"), is the husband of Miranda Rosas, an adult individual, citizen, and resident of the State of Arizona, residing at the above-captioned address, and makes claims of loss of consortium as described herein.

13.     Plaintiff, Colton Harp ("Plaintiff" or "Harp"), is an adult individual, citizen, and resident of the State of North Dakota residing at the above-captioned address.

14.     Plaintiff, Tamra Marie Harp ("Plaintiff" or "Mrs. Harp"), is the wife of Colton Harp, an adult individual, citizen, and resident of the State of North Dakota residing at the above-captioned address and makes claims of loss of consortium as described herein.

15.     Plaintiff, John Mazur-Baker ("Plaintiff or "Baker), is an adult individual, citizen, and resident of the State of Michigan residing at the above-captioned address.

16.     Plaintiff, Kelsey Mazur-Baker ("Plaintiff" or "Mrs. Baker"), is the wife of John Mazur-Baker, an adult individual, citizen, and resident of the State of Michigan residing at the above-captioned address and makes claims of loss of consortium as described herein.

17.    Benardino Nido ("Plaintiff or "Nido), is an adult individual, citizen, and resident of the State of Arizona residing at the above-captioned address.

18.    Plaintiff, Karina Nido ("Plaintiff" or "Mrs. Nido"), is the wife of Benardino Nido, an adult individual, citizen, and resident of the State of Arizona residing at the above-captioned address and makes claims of loss of consortium as described herein.

19.    Defendant, Sig Sauer, Inc. ("Sig Sauer" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

## JURISDICTION AND VENUE

20.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is perfect diversity of citizenship between the parties.  The defendant is a resident of the state of New Hampshire.  Each plaintiff resides in a state other than New Hampshire.  The amount in controversy exceeds $75,000.00.  The court may exercise personal jurisdiction over the defendant because it is a resident of New Hampshire.

21.    Venue is proper because a substantial part of the acts and omissions giving rise to this action occurred in New Hampshire.

## GENERAL ALLEGATIONS

22.    Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

23.    Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

4

24.     The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

25.     There have been over 150 incidents (and likely multiples more) of the Sig Sauer unintentionally discharging when users believed they did not pull the trigger.  Many of these unintended discharges have caused severe injury to the users and/or bystanders.

26.     The vast majority of these users are law enforcement officers, former military personnel, and/or trained and certified gun owners.

27.     At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

28.     This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s (hereinafter "Defendant" or "Sig Sauer"), negligence and defective design.

29.     Specifically, this matter involves a striker-fired pistol known as the "P320" that has fired without the trigger being pulled or deliberately actuated by the user, on numerous civilians and law enforcement agents across the nation.

30.     Prior to the incidents detailed below in this Complaint, Sig Sauer received multiple complaints and notifications of P320 pistols firing when the trigger was either not pulled, or not deliberately actuated by the user.

31.     In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:

## SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

32.     Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, many times.

33.     Defendant, Sig Sauer, had knowledge long before the sales of the P320s used by Plaintiffs that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker, a hinged trigger, and/or a grip safety.

34.     For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

35.     Years before the incident occurred, through and including the date of Plaintiffs' incidents herein, Sig Sauer expressly represented that the weapon could not fire without a trigger pull: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":



36.     In additional marketing material, under the heading "Striker Safety," Sig Sauer further states: the striker safety "[p]revents the striker from being released unless the trigger is pulled."

37.     At the same time, Sig Sauer contradictorily stated in the original owner's manual for the P320, which warns on page 25, that the weapon could fire if dropped without the trigger being pulled if a round were "chambered," i.e., inside the firing chamber of the weapon's slide.

38.     Many U.S. law enforcement agencies, local police departments, military personnel at a commander's discretion, and private owners routinely carry pistols with a chambered round.

39.     Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

40.     The "+ 1" represents a chambered round.

41.     Sig Sauer was aware of the latter fact at the time it designed and manufactured all its pistols, including the P320.  The P320 is the first striker-fired pistol[1] it has ever manufactured.

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.

42.     Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

43.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Sig Sauer's prototype P320s exhibited nearly 200 malfunctions during Army testing.  The Army demanded that Sig Sauer fix all problems associated with the prototype.

44.     The United States Army only agreed to the purchase of the P320 after Sig Sauer committed to designing an external manual safety for every military gun sold.

45.     Of the nearly 20 models of non-military P320s, only one (1) model offers a manual external safety as an "option."

46.     Sig Sauer's custom-design program allows for hundreds of thousands of different configurations of the P320 but does not allow users to add any type of external safety.

47.     An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.



48.     A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

49.     Upon information and belief, every striker-fired pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

50.     Upon information and belief, Sig Sauer manufactures the only striker-fired pistols on the market that are not equipped with any form of external manual safety.

51.     Upon information and belief, every single-action pistol on the market is equipped with some type of manual safety; whether it is a thumb safety, tab trigger safety, grip safety, or de-cocker.

52.     Upon information and belief, Sig Sauer manufactures the only single-action pistols on the market that are not equipped with any form of external manual safety.

53.     Sometime after January 2017, when a Connecticut law enforcement agent was shot by a P320 that fell to the ground from less than three feet, Sig Sauer removed the warning on page 25 from the original user manual regarding a chambered round, and replaced it with the following language:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge**.

(emphasis in original).

54.     Defendant, Sig Sauer had never before represented that mere "vibration" could cause the weapon to discharge.

55.     Upon information and belief, no other firearms manufacturer has ever made such a representation.

56.     Sig Sauer acknowledges in its own manuals that vibrations can cause its safety mechanisms to fail to work as designed.

57.     Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



58.     Despite their representations, Sig Sauer never made a tabbed trigger safety available as an option for the P320.[2]

59.     In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

---

[2] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for the entire trigger to be depressed; thus, preventing incidental discharges.

60.     When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer knew or should have known that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and that un-commanded discharges could occur in the ordinary course of using the weapon.

61.     Before Plaintiffs purchased their pistols, Sig Sauer was aware of other, prior un-commanded discharges of the P320 platform, and other Sig Sauer pistols, many of which pre-dated their purchases.

62.     In 2015, a Pennsylvania State Trooper and firearms instructor killed another trooper with his Sig Sauer pistol when it discharged without a trigger pull while conducting safety training.

63.     In 2016, a tactical response training instructor near Sacramento dropped his Sig Sauer, firing a bullet into a student's truck.

64.     In the period between 2012 and 2015, the New York City Police Department reported 10 un-commanded discharges involving Sig Sauer weapons.

65.     In February 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, Police Officer's vehicle when the officer moved to exit the vehicle during a snowstorm.  The incident was captured on the Officer's body-worn camera.

66.     In 2016, the Surprise, Arizona, Police Department complained to Sig Sauer of two (2) separate incidents of P320s firing without trigger pulls.

67.     In October 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

68.     In November 2016, a P320 fired un-commanded on an Officer in Holmes Beach, Florida, striking him in his leg.

69.     In 2017 in Michigan, a Sheriff's Deputy's Sig Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

70.     On January 5, 2017, a P320 shot a Stamford, Connecticut, SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

71.     On February 28, 2017, a P320 discharged without a trigger pull while in use by the University of Cincinnati Police Department.

72.     On June 14, 2017, a P320 discharged without a trigger pull in Wilsonville, Oregon.

73.     On June 20, 2017, a P320 discharged without a trigger pull while in use by the Howell Township, New Jersey Police Department.

74.     In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County, Virginia, Sheriff's Department, privately assuring its leadership, Sheriff David Chapman. that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[3]

75.     On July 28, 2017, a P320 discharged without a trigger pull in Tarrant County, Texas.

76.     On August 4, 2017, the Stamford SWAT team member sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

77.     Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

---

[3]     As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

78.     This statement was false, in view of Sig Sauer's knowledge that Officer Sheperis in Connecticut had been shot by a drop fire some eight months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

79.     On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standard for safety."

80.     This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

81.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when it created the Consumer Product Safety Commission in 1972.

82.     Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnect switch, and an improved sear to prevent un-commanded discharges.

83.     On August 9, 2017, the Police Chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

84.     In October 2017, a P320 discharged without a trigger pull in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered and fired simply when he struck the ground.

85.     On November 12, 2017, a P320 discharged without a trigger pull in Dallas County, Texas.

86.     On February 2, 2018, Tyler Herman of McCloud, Oklahoma, was removing a holster containing his P320 from his belt. While in the process of removing the holster, and without him touching the trigger, Herman's P320 discharged, striking Herman and causing catastrophic injuries.

87.     On February 7, 2018, Loudoun County, Virginia, Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur causing catastrophic skeletal injury, deformity, three general anesthesia surgeries, severe emotional distress, and related trauma, ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

88.     Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

89.     In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

90.     In June 2018, a Williams County, Ohio, Officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

91.     In May 2018, a Rancho Cucamonga, California, Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

92.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

93.     In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

94.     In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused severe tunneling wounds to his right leg.

95.     On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair event near Harvard Square.

96.     The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[4] on the P320.

97.     On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts, Police Department hitting him in his leg and causing substantial injuries to his leg.

98.     In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

99.     The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a

---

[4] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.SigSauersaueracademy.com/course/armorer-certification

potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

100.    On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

101.    On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

102.    On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

103.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California, Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

104.    The holster was a Safariland level three retention holster with a hood securing the pistol. The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and fellow officers by inches as it ricocheted into a locker door.

105.    On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, Police Department, as he was in the process of putting his duty belt on.

106.     Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

107.     On February 15, 2020, Pasco County Florida Sheriff's Deputy David Duff was injured when his P320 discharged without him pulling the trigger while the gun was in its holster on his duty belt.

108.     On February 27, 2020, Tampa Police Department Reserve Officer Howard Northrop was severely and permanently injured when his service-issued P320 discharged without a trigger pull, while inside his service-issued holster.

109.     Officer Northrop was struck in the left leg by a 9mm hollow-point bullet, which mushroomed and caused massive internal damage.

110.     On April 15, 2020, Yakima, Washington, Police Officer Nathan Henyan was injured when his P320 discharged from within its holster without him pulling the trigger.

111.     On June 19, 2020, Army veteran George Abrahams was injured when his P320 discharged without him pulling the trigger.

112.     At the time of Mr. Abrahams' incident, his P320 was contained within the holster which came in the box with his gun, which he was keeping in his pants pocket, which was fully zippered.

113.     On July 14, 2020, Milwaukee Police officer Adam Maritato was injured when his partner's duty-issued P320 discharged from within its holster while the two were attempting to detain a suspect.

114.     On July 27, 2020, ICE Agent Joseph Halase was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

115.    In 2020, a Wyoming Highway Patrol officer experienced an unintentional discharge, leading the Wyoming Highway Patrol to abandon the P320 as its standard duty weapon.

116.    On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

117.    Officer Slatowski's P320 fired while in its holster, and the casing did not eject.

118.    Officer Slatowski was severely wounded and has not been able to return to duty since the accident as of the date of this filing.

119.    On November 9, 2020, Tampa Police Officer Jerry Wyche was injured when his holstered P320 discharged without him pulling the trigger as he was getting out of his police vehicle.

120.    On December 8, 2020, ICE Agent Catherine Chargualaf was injured when her P320 discharged from within its holster without her pulling the trigger during a training exercise.

121.    On January 23, 2021, civilian Timothy Davis was injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

122.    On April 1, 2021, ICE Agent Fernando Armendariz was injured when his duty-issued P320 discharged without his finger touching the trigger while he was in the process of holstering the pistol.

123.    On May 12, 2021, Department of Homeland Security Agent Amy Hendel was injured when her P320 discharged without her pulling the trigger during a training exercise.

124.    On June 2, 2021, Troy, New York Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

125.    On June 15, 2021, Massachusetts resident Kyla Ellis was injured when her P320 discharged without her pulling the trigger while it was in its holster.

126.    On August 18, 2021, Richmond County, Georgia, Sheriff's Deputy James Garth was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

127.    On November 2, 2021, Florida resident Michael Parker was injured when his P320 discharged without him pulling the trigger while he was removing the fully holstered P320 from his pocket.

128.    On November 29, 2021, Atlantic County Prosecutor's Office Detective James Scoppa suffered severe tinnitus when his holstered P320 discharged without him pulling the trigger while he was inside of his car.

129.    On December 5, 2021, ICE Agent Mary Doffeny suffered severe emotional harm when her duty-issued P320 discharged from within a dedicated compartment in her purse.

130.    Ms. Doffeny's incident was caught on video, which clearly shows the gun going off without her pulling the trigger.

131.    On January 15, 2022, Connecticut resident Zachary Brown was injured when his P320 discharged from within its holster without Mr. Brown pulling the trigger while he was attempting to remove the holster from his pants.

132.    On February 7, 2022, Honesdale, Pennsylvania, Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

133.    Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

134.    Following this incident, the Honesdale, Pennsylvania, Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

135.    On February 12, 2022, former Navy Small Arms Instructor Dionicio Delgado was injured when his P320 discharged from within its holster without him pulling the trigger.

136.    On February 26, 2022, Texas resident Juan Duran was injured when his P320 discharged without him pulling the trigger while it was in his holster.

137.    On March 28, 2022, Houston, Texas, Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

138.    Sergeant Reyes' incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were not near his holster at the time the P320 discharged.

139.    On April 4, 2022, Georgia prosecutor Matthew Breedon was injured when his P320 discharged without him pulling the trigger while he was in the process of removing it from his holster.

140.    On May 25, 2022, former Georgia correctional officer and former Monticello, Georgia, police officer Dwight Jackson was injured when his holstered P320 discharged without him pulling the trigger.

141.    On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

142.    Plaintiffs hereby incorporate each of the unintended discharges involving a SIG Sauer P320 pistol which were pled in *Armendariz et. al. v. SIG Sauer* as well as *Bevacqua et. al. v. SIG Sauer,* consolidated under Case No. 1:23-00209-JL and presently active within the United States District Court for the District of New Hampshire.

143.    Following this incident, the third in as many years involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

144.    In response to the incidents of Milwaukee Police Officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022, that the Milwaukee Police Department would replace every single P320 in its arsenal with pistols manufactured by one of Sig Sauer's competitors.

145.    On November 7, 2022, Oklahoma resident William Clegg was injured when his P320 discharged from within its holster after making contact with a small wooden paddle.

146.    Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 discharge when the officer did not pull the trigger.

147.    Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed within the agency once it switched its primary weapon from a Glock to the P320.

148.    Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

149.    To date, Sig Sauer has never issued a mandatory recall of the P320 for repairs, though it has done so in the past for other of its products with far lesser sales.

150.    In an interview in 2013, Sig Sauer's former Chief Financial Officer, Timothy Scullin, just before the P320 was brought to market in 2014, noted that Sig Sauer's revenue had risen approximately 1,400 percent from 2012 to 2013. He further stated that Sig Sauer's growth has outpaced the firearms' industry's growth by "two or three times."

151.    When asked what are some of his biggest professional challenges that he has faced in his career, he stated:

> At Sig Sauer, to grow this fast, people get really challenged.  When you're growing 70 to 80 percent in a year, all the systems get stretched, and the people really get stretched. You have to be able to manage multiple tasks in a very fast environment, and in an environment that's highly regulated, so you can't mess up, otherwise you get shut down.  It just creates a tremendous of stress on the people in the system. But we've got people that have risen to the challenge.

152.    At all material times, the geographic location where the P320 was designed, manufactured, and placed into the stream of commerce was Sig Sauer's principal place of business in New Hampshire.

153.    At all material times, the geographic location of the actions and conduct Sig Sauer decided upon, initiated, and undertook as described in this Complaint was Sig Sauer's principal place of business in New Hampshire.

154.    At all material times, the geographic location of the marketing, communications and/or misrepresentations Sig Sauer decided upon, designed, created, initiated, engaged in and/or disseminated as described in this Complaint was Sig Sauer's principal place of business in New Hampshire.

155.    At all material times, Sig Sauer's principal place of business in New Hampshire was the geographic location of Sig Sauer's unfair and/or deceptive acts and/or practices in trade and commerce as described in this Complaint.

## PLAINTIFFS' INCIDENTS

### Jorge Luis Munoz Palacios

156.    Prior to February 2, 2022, Jorge Luis Munoz Palacios ("Officer Munoz") had undergone extensive firearms training as a gun owner.

157.    At all relevant times herein, Officer Munoz was employed as a Police Officer with the Puerto Rico State Police.

158.    On February 2, 2022, Officer Munoz was off duty running errands and was carrying a Sig Sauer P320 pistol in a holster on his left hip.

159.    When Officer Munoz returned to the vehicle, which was parked in the Walgreens parking lot in Ponce, Puerto Rico, he opened the car door to sit in the passenger's seat.

160.    As he sat in the passenger's seat, his P320 pistol discharged while in its holster and without Officer Munoz ever touching the trigger or intending the firearm to discharge.

161.    The bullet struck Officer Munoz in his left leg, causing substantial injury, maceration of tissue, burns, blood loss, and severe emotional trauma.

162.    Officer Munoz had to undergo surgery to remove the bullet lodged in his leg.

163.    While the full extent of the physical damage to Officer Munoz' leg is not yet known, he has had (and it is likely that he will have) trouble using his left leg as he did before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

164.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Officer Munoz' was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Officer Munoz' has in the past and is reasonably likely to require medicines, medical care and treatment.  Officer Munoz has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Officer Munoz has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Officer Munoz has in the past and may in the

future continue to be disabled from performing his usual duties, occupations, and avocations, all to Officer Munoz's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Officer Munoz, who has received substantial and ongoing treatments and medicines.

**Ray Tillotson**

165.    Prior to February 28, 2022, Ray Tillotson had undergone extensive firearms training in his capacity as a member of the Howell Township Police Department in Howell, New Jersey.

166.    On February 28, 2022, Officer Tillotson attended a course to become a firearms instructor which was located at the State Police Academy in Seagirt, New Jersey.

167.    The qualification course included various shooting drills and tasks, and required officers to shoot while kneeling and standing.  The course also required officers to shoot at different distances with accuracy and proficiency.

168.    Officer Tillotson was using his duty-issued Sig Sauer P320 pistol on February 28, 2022, at the Police Academy training facility.

169.    While Officer Tillotson holstered his Sig P320, the pistol discharged without squarely pulling the trigger or intending the gun to go off.

170.    The bullet entered Officer Tillotson's leg, and he required emergency medical attention.

171.    Immediately, his fellow police officers wrapped a tourniquet around his leg and took him by emergency vehicle to the Jersey Shore University Medical Center in Neptune City, NJ.

172.    The bullet tore through Officer Tillotson's calf and lodged in the top of his foot.

173.    At the time of the unexpected discharge, Officer Tillotson's P320 was in its holster.

174.    While the full extent of the physical damage Officer Tillotson sustained is not yet known, it is likely that he will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

175.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Officer Tillotson was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Officer Tillotson has in the past and is reasonably likely to require medicines, medical care and treatment.  Officer Tillotson has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Officer Tillotson has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Officer Tillotson has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Officer Tillotson's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Officer Tillotson who has received substantial and ongoing treatments and medicines.

**Vincent Cicala**

176.    Prior to March 30, 2022, Officer Vincent Cicala had undergone extensive firearms training as a police officer.

177.    At all relevant times, Officer Cicala was a police officer for the Phillipsburg Township Police Department located in Phillipsburg, New Jersey, Warren County.

178.    On March 30, 2022, Officer Cicala was in the locker room of the Phillipsburg Township Police Department changing out of his uniform.

179.    While attempting to take off his duty belt, on which his Sig Sauer P320 duty pistol was secured within its holster, the pistol discharged sending a round into the floor.

180.    Officer Cicala has experienced hearing loss and tinnitus in both ears due to the unintended discharge as well as emotional distress and anxiety.

181.    Officer Cicala did not place his finger onto the trigger within the trigger guard and did not intend the gun to discharge.

182.    While the full extent of the physical and psychological injuries to Officer Cicala is not yet known, he has had (and it is likely that he will have) continue to have hearing impairment and other permanent physical injuries, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

183.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Officer Cicala was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Officer Cicala has in the past and is reasonably likely to require medicines, medical care and treatment.  Officer Cicala has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Officer Cicala has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Officer Cicala has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Officer Cicala's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Officer Cicala, who has received substantial and ongoing treatments and medicines.

**Miranda Rosas**

184.    On June 19, 2022, Miranda Rosas was injured when her Sig Sauer P320 pistol discharged without her pulling the trigger.

185.    That day, Ms. Rosas was at her home in El Mirage, Arizona, and had just returned from church.  It was Father's Day.

186.    Ms. Rosas' husband, Gilberto Ramirez Rosas, Jr., placed his holstered Sig Sauer P320 pistol on the top of the couch in their home.

187.    A guest of the Rosas family attending the gathering sat down on a chair near the couch and came into contact with the couch causing the holstered pistol to fall to the ground.

188.    When the holstered P320 hit the ground, it discharged.

189.    The bullet traveled from the gun, through the holster, through a kitchen cabinet, into Ms. Rosas' buttocks and lodged in her upper thigh area.

190.    Ms. Rosas has experienced and continues to experience for an indefinite time into the future chronic pain, limited mobility, sciatic pain and pain in her buttocks and thigh where the bullet and scarring is located.

191.    While the full extent of the physical damage to Ms. Rosas' body is not yet known, she has had (and it is likely that he will have) trouble walking, sitting, or standing as she had before the incident, and will likely never be able to return to her pre-incident form as a result of diminished physical capacity.

192.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Ms. Rosas was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Ms. Rosas has in the past and is reasonably likely to require medicines,

medical care and treatment.  Ms. Rosas has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Ms. Rosas has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Ms. Rosas has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Ms. Rosas' great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Ms. Rosas, who has received substantial and ongoing treatments and medicines.

**Colton Harp**

193.    On June 24, 2022, Colton Harp was injured when his Sig Sauer P320 pistol discharged without his pulling the trigger.

194.    That day, Mr. Harp was getting ready for work and had his P320 in his waistband holster.

195.    While wearing the holstered P320, it discharged and struck his right buttock.

196.    Mr. Harp did not squarely place his finger onto the trigger within the trigger guard and did not intend the gun to discharge.

197.    While the full extent of the physical damage to Mr. Harp is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

198.    As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Mr. Harp was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Mr. Harp has in the past and is reasonably likely to require medicines, medical

care and treatment. Mr. Harp has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Mr. Harp has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish. Mr. Harp has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Mr. Harp's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Mr. Harp, who has received substantial and ongoing treatments and medicines.

**John Mazur-Baker**

199. On August 10, 2022, in Vicksburg, Michigan, John Mazur-Baker was injured when his Sig Sauer P320 pistol discharged without him pulling the trigger.

200. That day, at approximately 2:50 p.m., Mr. Mazur-Baker was in his home and his P320 pistol was secured in a holster attached to his belt.

201. When Mr. Mazur-Baker removed the belt with the attached holster, the P320 discharged while secured in the holster.

202. Prior to August 10, 2022, John Mazur-Baker had extensive experience safely handling firearms: he is an honorably discharged U.S. Marine Corps Veteran and a certified USCCA Firearms Instructor.

203. Mr. Mazur-Baker did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

204. The bullet struck Mr. Mazur-Baker in his right leg in his upper hamstring, exited through the left side of his right knee, then entered his left calf muscle. Both legs have scarring.

205. Mr. Mazur-Baker now has a permanent limp, deformities on his right leg, and scarring to both legs. He suffered a heart attack due to this incident.

206.     While the full extent of the physical damage to Mr. Mazur-Baker is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

207.     Mr. Mazur-Baker's injuries are permanent, and he cannot participate in activities with his children as he otherwise could before this incident.

208.     As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Mr. Mazur-Baker was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined.  Mr. Mazur-Baker has in the past and is reasonably likely to require medicines, medical care and treatment.  Mr. Mazur-Baker has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Mr. Mazur-Baker has in the past and may in the future continue to suffer agonizing aches, pains, and psychological and emotional anguish.  Mr. Mazur-Baker has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Mr. Mazur-Baker's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Mr. Mazur-Baker, who has received substantial and ongoing treatments and medicines.

**Benardino Nido**

209.     On August 24, 2022, in Tucson, Arizona, Benardino Nido was struck in the leg with a round from his duty issued Sig Sauer P320 when it struck a table and discharged.

210.     At all relevant times herein, Benardino Nido was an agent with the U.S. Immigration and Customs Enforcement ("ICE").

211. Prior to August 24, 2022, Agent Nido had undergone extensive firearms training as a federal law enforcement agent.

212. On August 24, 2022, Agent Nido was scheduled for Firearms training and ICE Handgun Qualification with his Sig Sauer P320.

213. At approximately 10:30 a.m., Agent Nido concluded the qualification and was instructed to gather his gear and secure it in his vehicle for the second part of our training.

214. Agent Nido placed his range bag over his shoulder and picked up his duty belt from the table, and his assigned Sig Sauer P320 slid out of the holster and hit the table.

215. Upon the P320 making contact with the table, it accidentally discharged, striking Agent Nido in his upper right thigh.

216. Agent Nido did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

217. While the full extent of the physical damage to Agent Nido's leg is not yet known, he has had (and it is likely that he will have) trouble running, sitting, or standing as he had before the incident, and will likely never be able to return to his pre-incident form as a result of diminished physical capacity.

218. As a direct and proximate result of Defendant's negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Agent Nido was forced to suffer serious, disabling, and permanent injuries and emotional distress, the full extent of which has yet to be determined. Agent Nido has in the past and is reasonably likely to require medicines, medical care and treatment. Agent Nido has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical care and treatment. Agent Nido has in the past and may in the future continue to suffer agonizing aches, pains, and

psychological and emotional anguish.  Agent Nido has in the past and may in the future continue to be disabled from performing his usual duties, occupations, and avocations, all to Agent Nido's great loss and detriment. The incident has resulted in substantial physical harm and related trauma to Agent Nido, who has received substantial and ongoing treatments and medicines.

## COUNT 1 – NEGLIGENCE
## JORGE LUIS MUNOZ PALACIOS V. SIG SAUER

219.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

220.    At all relevant times, Sig Sauer owed Officer Munoz the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

221.    At all relevant times, Sig Sauer owed Officer Munoz the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

222.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Officer Munoz, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

223.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.       By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Officer Munoz, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

224.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

225.    The gun's defective condition was not visible, and Officer Munoz was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

226.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 19, 2022, unintended discharge and Officer Munoz' injuries.

227.    As a direct and proximate result of the negligence set forth in this Count, Officer Munoz suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, and loss of earnings and earning capacity.  In addition, Officer Munoz has incurred and may continue to incur medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Officer Munoz will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT 2 - STRICT PRODUCT LIABILITY**
**JORGE LUIS MUNOZ PALACIOS V. SIG SAUER**

228.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

229.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

230.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

231.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

232.    The defective condition of the P320 caused Plaintiff's injuries.

233.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT 3 – NEGLIGENCE
### RAY TILLOTSON V. SIG SAUER

234.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

235.    At all relevant times, Sig Sauer owed Tillotson the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

236.    At all relevant times, Sig Sauer owed Tillotson the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

237.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Tillotson, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

238.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Tillotson, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

239.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

240.    The gun's defective condition was not visible, and Tillotson was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

241.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the March 31, 2020, unintended discharge and Tillotson's resultant injuries.

242.    As a direct and proximate result of the negligence set forth in this Count, Tillotson suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, and loss of earnings and earning capacity.  In addition, Tillotson has incurred and may continue to incur medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Tillotson will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT 4 - STRICT PRODUCT LIABILITY
### RAY TILLOTSON V. SIG SAUER

243.     Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

244.     Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

245.     The P320 was in a defective condition as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

246.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

247.    The defective condition of the P320 caused Plaintiff's injuries.

248.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT 5 - NEGLIGENCE
### VINCENT CICALA V. SIG SAUER

249.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

250.    At all relevant times, Sig Sauer owed Cicala the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

251.    At all relevant times, Sig Sauer owed Cicala the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

252.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Cicala, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

253.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.     By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Cicala, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.     By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

254.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

255.    The gun's defective condition was not visible and Cicala was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

256.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the August 4, 2020 unintended discharge and Cicala's resultant injuries.

257.    As a direct and proximate result of the negligence set forth in this Count, Cicala suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, and loss of earnings and earning capacity.  In addition, Cicala has incurred and may continue to incur medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Cicala will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT 6 - STRICT PRODUCT LIABILITY
### VINCENT CICALA V. SIG SAUER

258.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

259.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

260.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

261.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

262.    The defective condition of the P320 caused Plaintiff's injuries.

263.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT 7 – NEGLIGENCE
### MIRANDA ROSAS V. SIG SAUER

264.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

265.    At all relevant times, Sig Sauer owed Ms. Rosas the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

266.    At all relevant times, Sig Sauer owed Ms. Rosas the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

267.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Ms. Rosas, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

268.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.       By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.      By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.    By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Rosas, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.    By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.    By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xiv.    Other negligent acts and omissions to be developed in the course of discovery.

269.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

270.    The gun's defective condition was not visible, and Ms. Rosas was not capable of realizing the dangerous condition, nor could she have discovered the dangerous condition even upon performing a reasonable inspection of the same.

271.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused May 17, 2021, unintended discharge and Ms. Rosas' resultant injuries.

272.    As a direct and proximate result of the negligence set forth in this Count, Ms. Rosas suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, and loss of earnings and earning capacity.  In addition, Ms. Rosas has incurred and may continue to incur medical, attendant care and life care expenses for her care and treatment.  These injuries are either permanent or continuing in their nature, and Rosas will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT 8 - STRICT PRODUCT LIABILITY
### MIRANDA ROSAS V. SIG SAUER

273.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

274.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

275.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

276.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

277.    The defective condition of the P320 caused Plaintiff's injuries.

278.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT 9 – NEGLIGENCE
### COLTON HARP V. SIG SAUER

279.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

280.    At all relevant times, Sig Sauer owed Harp the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

281.    At all relevant times, Sig Sauer owed Harp the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

282.    At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Harp, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

283.    Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.      By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.      By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.      By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.      By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.      By negligently failing to unambiguously warn purchasers and end users of the gun, including Harp, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.      By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.      By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.      By including a defective and improper holster in the original packaging with the gun;

x.      By misrepresenting the dangers and hazards posed by the gun;

> xi.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;
>
> xii.    By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;
>
> xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors; and
>
> xiv.    Other negligent acts and omissions to be developed in the course of discovery.

284.    Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

285.    The gun's defective condition was not visible, and Harp was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

286.    Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the October 4, 2022, unintended discharge and Harp's resultant injuries.

287.    As a direct and proximate result of the negligence set forth in this Count, Harp suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, and loss of earnings and earning capacity.  In addition, Harp has incurred and may continue to incur medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Harp will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT 10 - STRICT PRODUCT LIABILITY
### COLTON HARP V. SIG SAUER

288.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

289.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.  Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.  The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.  The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.  The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

290.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

291.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

51

292.   The defective condition of the P320 caused Plaintiff's injuries.

293.   Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT 11 – NEGLIGENCE
## JOHN MAZUR-BAKER V. SIG SAUER

294.   Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

295.   At all relevant times, Sig Sauer owed Mazur-Baker the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

296.   At all relevant times, Sig Sauer owed Mazur-Baker the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

297.   At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Mazur-Baker, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

298.   Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.   By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.   By negligently failing to unambiguously warn purchasers and end users of the gun, including Mazur-Baker, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.  By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii. By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.   By including a defective and improper holster in the original packaging with the gun;

x.    By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber.

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors.

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

299.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

300.   The gun's defective condition was not visible, and Mazur-Baker was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

301.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 16, 2022, unintended discharge and Mazur-Baker' resultant injuries.

302.   As a direct and proximate result of the negligence set forth in this Count, Mazur-Baker suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, and loss of earnings and earning capacity.   In addition, Mazur-Baker has incurred and may continue to incur medical, attendant care and life care expenses for his care and treatment.   These injuries are either permanent or continuing in their nature, and Mazur-Baker will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

### COUNT 12 - STRICT PRODUCT LIABILITY
### JOHN MAZUR-BAKER V. SIG SAUER

303.    Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

304.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

    a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

    b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

    c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

    d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

305.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

306.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

307. The defective condition of the P320 caused Plaintiff's injuries.

308. Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT 13 – NEGLIGENCE
### BENARDINO NIDO V. SIG SAUER

309. Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth herein.

310. At all relevant times, Sig Sauer owed Nido the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user trigger pull before selling the gun and placing it into the stream of commerce.

311. At all relevant times, Sig Sauer owed Nido the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a trigger pull before selling the gun and placing it into the stream of commerce.

312. At all relevant times, Sig Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Nido, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. Upon information and belief, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

313. Sig Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

ii.    By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

iii.   By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

iv.    By failing to issue a mandatory recall of the P320 as SIG SAUER had done in the past with other defective products;

v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

vi.    By negligently failing to unambiguously warn purchasers and end users of the gun, including Nido, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vii.   By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG SAUER, and during which times employees, servants or agents of SIG SAUER had an opportunity to inspect, service and work on the gun;

viii.  By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of un-commanded discharges;

ix.    By including a defective and improper holster in the original packaging with the gun;

x.     By misrepresenting the dangers and hazards posed by the gun;

xi.   By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

xii.   By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

xiii.   By failing to incorporate safeties which were standard among all of the P320s' competitors;

xiv.   Other negligent acts and omissions to be developed in the course of discovery.

314.   Sig Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

315.   The gun's defective condition was not visible, and Nido was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

316.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the November 29, 2022, unintended discharge and Nido's resultant injuries.

317.   As a direct and proximate result of the negligence set forth in this Count, Nido suffered mental anguish, inconvenience, loss of the capacity for the enjoyment of life and loss of earnings and earning capacity.  In addition, Nido has incurred and may continue to incur medical, attendant care and life care expenses for his care and treatment.  These emotional injuries are either permanent or continuing in their nature, and Nido will suffer such losses and impairments in the future.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT 14 - STRICT PRODUCT LIABILITY
### BENARDINO NIDO V. SIG SAUER

318.     Plaintiffs re-adopt and re-allege all paragraphs of this pleading as if fully set forth

herein.

319.     Sig Sauer, by and through its agents, servants, workers, contractors, designers,

assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of

the Restatement (Second) of Torts because:

a.  Sig Sauer is engaged in the regular business of designing, assembling,
manufacturing, selling, supplying, distributing, and/or placing into the
stream of commerce firearms, including the P320 that injured Plaintiff;

b.  The product involved in the subject incident was marketed and/or placed in
the general stream of commerce by Sig Sauer;

c.  The product was expected to and did reach users without substantial change
in the condition in which it was designed, assembled, manufactured, sold,
supplied, distributed and/or placed into the stream of commerce;

d.  The product was designed, assembled, manufactured, sold, supplied,
distributed, and/or placed into the stream of commerce in the defective
condition for the reasons set forth above.

320.     The P320 was in a defective condition, as a reasonable person would conclude that

the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of

taking precautions.

321.     Sig Sauer breached its duties, by and through their agents, servants, workers and/or

employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in

the performance of its obligations.

322.     The defective condition of the P320 caused Plaintiff's injuries.

323.     Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Sig Sauer for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT 15 – LOSS OF CONSORTIUM**
**JESSICA CICALA. V. SIG SAUER**

324.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

325.    At all relevant times hereto, Plaintiff, Jessica Cicala was the lawfully wedded wife of husband-plaintiff, Vincent Cicala, with whom she lives.

326.    As a result of the injuries sustained by Mr. Cicala, wife-plaintiff Mrs. Cicala has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT 16 – LOSS OF CONSORTIUM**
**GILBERT RAMIREZ ROSAS, JR. V. SIG SAUER**

327.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

328.    At all relevant times hereto, Plaintiff, Gilbert Ramirez Rosas, Jr., was the lawfully wedded husband of wife-plaintiff, Miranda Rosas, with whom he lives.

329.    As a result of the injuries sustained by Ms. Rosas, husband-plaintiff Mr. Rosas has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT 17 – LOSS OF CONSORTIUM**
**TAMRA MARIE HARP V. SIG SAUER**

330.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

331.    At all relevant times hereto, Plaintiff, Tamra Marie Harp, was the lawfully wedded wife of husband-plaintiff, Colton Harp, with whom she lives.

332.    As a result of the injuries sustained by Mr. Harp, wife-plaintiff Tamra Marie Harp has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT 18– LOSS OF CONSORTIUM**
**KELSEY MAZUR-BAKER V. SIG SAUER**

333.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

334.    At all relevant times hereto, Plaintiff, Kelsey Mazur-Baker, was the lawfully wedded wife of husband-plaintiff, John Mazur-Baker, with whom she lives.

335.    As a result of the injuries sustained by Mr. Mazur-Baker, wife-plaintiff Mrs. Kelsey Mazur-Baker, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for

compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

**COUNT 19 – LOSS OF CONSORTIUM**
**KARINA NIDO V. SIG SAUER**

336.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint, the same as if fully set forth hereinafter.

337.    At all relevant times hereto, Plaintiff, Karina Nido, was the lawfully wedded wife of Benardino Nido, with whom she lives.

338.    As a result of the injuries sustained by Mr. Nido, wife-plaintiff Karina Nido, has been and will continue to be deprived of the love, assistance, companionship, consortium and society of her husband, all to her great loss and detriment.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**DOUGLAS, LEONARD & GARVEY, P.C.**

Date:  February 27, 2024          By:    */s/ Benjamin T King*
                                         BENJAMIN T. KING, NH Bar #12888
                                         14 South Street, Suite 5
                                         Concord, NH 03301
                                         (603) 224-1988
                                         benjamin@nhlawoffice.com

                                         and

**SALTZ MONGELUZZI & BENDESKY P.C.**

Date:  February 27, 2024    By:    */s/ Robert Mongeluzzi*
        ROBERT MONGELUZZI, PA Bar #36283
        *pro hac vice forthcoming*
        LARRY BENDESKY, PA Bar # 51026
        *pro hac vice forthcoming*
        ROBERT W. ZIMMERMAN, PA Bar #208410
        *pro hac vice forthcoming*
        SAMUEL A. HAAZ, PA Bar #314507
        *pro hac vice forthcoming*
        RYAN D. HURD, PA Bar #205955
        *pro hac vice forthcoming*
        One Liberty Place, 52nd Floor
        1650 Market Street
        Philadelphia, PA 19103
        (215) 496-8282
        rmongeluzzi@smbb.com
        lbendesky@smbb.com
        rzimmerman@smbb.com
        shaaz@smbb.com
        rhurd@smbb.com